

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:20-cr-168-T-23SPF
    18 U.S.C. § 1349

SAMUEL FRIEDMAN

## INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy to Commit Health Care Fraud)

**A.  Introduction**

At times material to this Information:

1.  The defendant, SAMUEL FRIEDMAN, resided in Pasco County, Florida, which is within the Middle District of Florida. FRIEDMAN owned and operated SKF Enterprises, Inc. ("SKF"), which is also within the Middle District of Florida.

2.  SKF was a telemarketing operation targeting the Medicare-aged population. During calls, representatives inquired about consumers' Medicare eligibility and their interest in receiving a brace or braces (meaning "durable medical equipment" or DME). Representatives harvested this information along with beneficiaries' personally identifying information ("PII") to begin forming

brace orders. SKF then, including through intermediaries, bribed doctors and other medical practitioners to sign and to prescribe the brace orders under the guise of "telemedicine." Once signed, SKF sold the brace orders for approximately $200 per brace to third-parties, including A.A., C.B., A.W., R.D., and others, for submission to Medicare and other federal health benefit programs.

*The Medicare Program*

3. The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

4. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

5. To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as enrolling DME suppliers into the Medicare program and processing Medicare claims. In performing such functions, MACs were assigned to particular geographical "jurisdictions." For DME claims, they were called Jurisdictions A, B, C, and D.

6. Medicare was made up of several component "parts" that covered different items and services. Medicare Part A, for example, covered inpatient hospital stays. Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices, referred to as DME (such as the braces referred to above in paragraph 2).

7. Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

8. Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC ("CGS"), and (ii) Noridian Healthcare Solutions ("Noridian"). Together, CGS and Noridian are referred to herein as the "DME MACs."

*DME Claims Submission under Medicare Part B*

9. Claims for DME supplies could be submitted for payment to the MAC through an "Electronic Data Interchange ("EDI") system. EDI was a computer-to-computer electronic exchange of business documents using a standard format. An EDI allowed a DME supplier the ability to transmit Electronic Media Claims ("EMC") to Medicare in a compliant format. Medicare, in turn, required that a DME supplier complete a Common Electronic Data Interchange ("CEDI") agreement for EDI services with a DME MAC. The CEDI

agreement required the DME supplier to agree to several terms and conditions, including:

    a.   that it would be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents;

    b.   that it would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so, and certify that required beneficiary signatures, or legally authorized signatures on behalf of beneficiaries, were on file;

    c.   that it would submit claims that are accurate, complete, and truthful;

    d.   that it would affix the CMS-assigned unique identifier number (submitter ID) of the provider on each claim electronically transmitted to the A/B MAC, CEDI, or other contractor if designated by CMS;

    e.   that the CMS-assigned unique identifier number (submitter identifier) or NPI constituted the provider's (or the DME supplier's) legal electronic signature and its assurance that services were performed as billed; and

    f.   that it would acknowledge that all claims would be paid from Federal funds, that the submission of such claims was a claim for payment under the Medicare program, and that anyone who misrepresented or falsified or caused to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement was, upon conviction, subject to a fine and/or imprisonment under applicable Federal law.

10.   Both methods of filing claims required the submission of certain information relating to a specific patient or beneficiary. The information necessary for a DME claim included:

    a.    the type of service provided, identified by an "HCPCS" code (meaning "Healthcare Common Procedure Coding System");

    b.    the date of service or supply;

    c.    the referring physician's NPI;

    d.    the charge for such services;

    e.    patient's diagnosis;

    f.    the NPI for the DME entity seeking reimbursement; and

    g.    certification by the DME provider that the supplies are medically necessary.

11.    Further, before submitting a claim for an orthotic brace to the DME MAC, a supplier was required to have on file the following:

    a.    written documentation of a verbal order or a preliminary written order from a treating physician;

    b.    a detailed written order from the treating physician;

    c.    information from the treating physician concerning the beneficiary's diagnosis;

    d.    any information required for the use of specific modifiers;

    e.    a beneficiary's written assignment of benefits; and

    f.    proof of delivery of the orthotic brace to the beneficiary.

12.    Finally, under Medicare Part B, providers were not permitted to routinely waive copayments, which were the portion of the cost of an item paid by a beneficiary.

*Proper Telehealth Services for Medicare Beneficiaries*

13. Telemedicine was a means of connecting patients to providers via a telecommunication technology, such as video-conferencing. Telemedicine companies hired physicians and other providers to furnish telemedicine services to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. In order to generate revenue, telemedicine companies typically either billed the Medicare program or other health insurance program, or offered a membership program to patients.

14. Some telemedicine companies offered membership programs to patients who signed a contract for telemedicine services, paid a set dollar amount per month, and paid a fee each time the patient had a telemedicine encounter with one of its providers.

15. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included, among others: (a) that the beneficiary was typically located in a rural area (meaning, outside a "Metropolitan Statistical Area" or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at home—during the telehealth service furnished by a remote practitioner.

*CHAMPVA*

16.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA beneficiaries included the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses or children of veterans who had died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

### B.    The Conspiracy

17.     Beginning in or about January 2017, and continuing until in or about April 2019, in the Middle District of Florida and elsewhere, the defendant,

SAMUEL FRIEDMAN

7

did knowingly and willfully combine, conspire, confederate, and agree with with others, including A.A., C.B., A.W., R.D., and others, to commit health care fraud, in violation of 18 U.S.C. § 1347.

### C. Manner and Means of the Conspiracy

18. The manner and means by which the defendant and his conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

   a. It was part of the conspiracy that FRIEDMAN and other conspirators (collectively, the "SKF Conspirators"), would and did run a telemarketing operation known as SKF targeting the Medicare-aged population to generate DME brace orders.

   b. It was further a part of the conspiracy that, to target Medicare beneficiaries, the SKF Conspirators would and did obtain personally identifying information or "PII"—such as names, dates of birth, and/or Medicare ID numbers—for the Medicare-aged population, including by purchasing PII from known "lead generators."

   c. It was further a part of the conspiracy that representatives at SKF would and did call, or purport to call, Medicare beneficiaries to inquire about, among other information, the beneficiaries' Medicare eligibility, their health status, and whether they wanted DME braces.

      d.    It was further a part of the conspiracy that representatives at SKF would and did make written electronic records of the calls, and purported calls, to Medicare beneficiaries to build DME brace orders.

      e.    It was further a part of the conspiracy that, through automation and other electronic means, the SKF Conspirators would and did cause the transmission of Medicare beneficiaries' DME brace orders to medical practitioners through purported "telemedicine" vendors.

      f.    It was further a part of the conspiracy that the SKF Conspirators would and did offer and pay illegal bribes through intermediaries to medical practitioners to induce them to sign and to prescribe the DME brace orders under the guise of "telemedicine."

      g.    It was further a part of the conspiracy that, often, the medical practitioners would and did sign the DME brace orders without ever contacting the Medicare beneficiaries, rather than conducting compliant telehealth consultations as required.

      h.    It was further a part of the conspiracy that the purported "telemedicine" vendors would and did electronically transmit, or cause the transmission of, signed DME brace orders, which were secured through illegal bribes (the "illegal DME claims"), to the SKF Conspirators.

i. It was further a part of the conspiracy that the SKF Conspirators would and did sell, or caused the sale of, of doctors' orders to other conspirators, including A.A., C.B., A.W., R.D., and others, for submission to Medicare in exchange for at least approximately $2.6 million.

j. It was further part of the conspiracy that the conspirators would and did participate in meetings, perform acts, and make statements to accomplish the objects of and to conceal the conspiracy.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE

1. The allegations contained in Count One of this Information are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(7).

2. Upon conviction for the violations alleged in Count One, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of $3.42 million which is the amount the defendant obtained as a result of the commission of the offense, and the following asset

which constitutes proceeds traceable to the commission of the offense: approximately $474,657.53 seized from TD Bank account number 4312312658, in the name of SKF Enterprises, LLC.

  4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

          MARIA CHAPA LOPEZ
          United States Attorney

      By: _____
         Kristen A. Fiore
         Assistant United States Attorney

      By: _____
         Jay G. Trezevant
         Assistant United States Attorney
         Chief, Economic Crimes Section